| | | |
|---|---|---|
| PANKAJKUMAR LOHABARE | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| HOME RECOVERY OF VIRGINIA, INC. | ) | |
| d/b/a HOME RECOVERY – HOME AID; | ) | **JURY TRIAL DEMAND** |
| TIMOTHY M. PETRY; | ) | |
| BRUCE C. HAYDEN; KATHY HAYDEN; | ) | |
| and HYUN L. SCHEMINANT, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT

Pankajkumar Lohabare ("Plaintiff" or "Mr. Lohabare"), by and through counsel, submits this Complaint against Home Recovery of Virginia, Inc. d/b/a Home Recovery – Home Aid ("HCS/HR"), Timothy M. Petry ("Petry"), Bruce C. Hayden ("Mr. Hayden,"), Kathy Hayden ("Mrs. Hayden"), and Hyun L. Scheminant ("Scheminant," collectively, "Defendants"), to recover unpaid wages, unpaid benefits, compensatory damages, liquidated damages, punitive damages, and attorneys' fees, and costs for Defendants' violations of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"), the D.C. Minimum Wage Act, D.C. Code Ann. § 32-1001 *et seq.*, ("DCMWA"), and the D.C. Payment and Collection of Wages Law, D.C. Code Ann. § 32-1301 *et seq.* ("DCPCWL"). Mr. Lohabare further brings claims for damages arising from breach of contract under the laws of the District of Columbia, and for actual and constructive fraud, civil conspiracy to commit fraud, and conversion under Virginia common law.

## PARTIES AND RELEVANT NON-PARTIES

1. Defendant HCS/HR is a staffing company, which provides staff to home health care companies. HCS/HR is registered to conduct business in the Commonwealth of Virginia.

2. Defendant Petry is the CEO and President of HCS/HR.

3. Home Care Solutions ("HCS") was a staffing company which provided staff to home health care companies. HCS was formerly registered to conduct business in the Commonwealth of Virginia.

4. Defendant Mr. Hayden served as the CEO and President of HCS prior to the acquisition of the company by Petry.

5. Upon information and belief, HCS/HR is, in all respects, the successor of HCS.

6. Upon information and belief, HCS/HR acquired all assets and liabilities of HCS upon the transition of ownership from Hayden to Petry in or around March of 2016.

7. Defendant Mrs. Hayden is the wife of Mr. Hayden, and served as the Director of Administrative Operations at HCS prior to acquisition of the company by Petry.

8. Defendant Scheminant served as the Regional Account Manager and Director of Administrative Operations at HCS both prior to, and following, acquisition of the company by Petry.

9. Harold J. Lamboley, III ("Lamboley") is an attorney at the Lamboley Law Firm, LLC, and is licensed to practice law in Connecticut.

10. Lamboley provided legal assistance to Defendants in connection with the immigration matters that arose during Defendants' hiring and employment of Mr. Lohabare.

11. At all times during his employment with Defendants, Plaintiff was a resident of Virginia and held an H-1B work visa permitting him to work in the United States.

12. Plaintiff has since moved to South Carolina.

13. Plaintiff was employed to provide home healthcare services by HCS and subsequently, by HCS/HR.

14. Mr. Hayden hired Mr. Lohabare on or about June of 2014 to work for HCS.

15. Mr. Lohabare's Employment Agreement, attached hereto as Exhibit A, with HCS ("Employment Agreement") expressly states the Employment Agreement is governed by the laws of the District of Columbia.

16. Plaintiff was an "employee" of Mr. Hayden, Mr. Petry and HCS/HR, as defined and/or interpreted by the FLSA, 29 U.S.C. § 203(e).

17. Plaintiff was an "employee" of Mr. Hayden, Mr. Petry and HCS/HR, as defined and/or interpreted by the DCMWA, D.C. Code Ann. § 32-1002(2), and the DCPCWL, D.C. Code Ann. § 32-1301(2).

18. Mr. Hayden, Mr. Petry and HCS/HR were "employers" of Plaintiff, as defined and/or interpreted by the FLSA, 29 U.S.C. § 203(d).

19. Mr. Hayden, Mr. Petry and HCS/HR were "employers" of Plaintiff, as defined and/or interpreted by the DCMWA, D.C. Code Ann. § 32-1002(3), and the DCPCWL, D.C. Code Ann. § 32-1301(1).

20. Upon transfer of ownership of HCS to HCS/HR on or around March of 2016, Petry and HCS/HR became "employers" of Plaintiff, as defined and/or interpreted by the DCMWA, D.C. Code Ann. § 32-1002(3), and the DCPCWL, D.C. Code Ann. § 32-1301(1).

21. The transfer of ownership of HCS/HR by Mr. Hayden to Petry included the transfer of obligations and responsibilities of the company under Plaintiff's Employment Agreement.

22.     Specifically, paragraph 14 of Plaintiff's Employment Agreement states: "This Agreement shall be binding upon and shall inure to the benefit of Contractor and the Company and to the Company's successors and assigns."

## JURISDICTION AND VENUE

23.     This Court has federal question jurisdiction over the subject matter of this complaint pursuant to 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States; specifically, the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq*.

24.     This Court has supplemental subject matter jurisdiction over Mr. Lohabare's state law claims pursuant to 28 U.S.C. § 1367.

25.     Petry, Mr. Hayden, Mrs. Hayden, and Scheminant are subject to personal jurisdiction of the Court in this judicial district, because Mr. Lohabare's claims arise out of conduct occurring in this district.

26.     Petry and Mr. Hayden regularly conduct business within this judicial district.

27.     HCS/HR is subject to personal jurisdiction of the Court in this district because it regularly conducts business within this judicial district.

28.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendants conduct business within this judicial district and the events described in this action took place within this judicial district.

## FACTS AND ALLEGATIONS

*Dates of Employment and Schedule*

29.     Mr. Lohabare worked for Mr. Hayden and HCS from June of 2014 until approximately January of 2016.

4

30. Mr. Lohabare continued working for HCS/HR after Mr. Petry acquired HCS on or about March 22, 2016.

31. Mr. Lohabare provided home health care services as directed by HCS/HR.

32. Throughout his employment with HCS/HR, Mr. Lohabare frequently worked for over forty (40) hours per week.

33. Throughout his employment with HCS/HR, Mr. Lohabare completed patient paperwork at his home and HCS/HR did not compensate Mr. Lohabare for the time he spent performing this task.

34. Throughout his employment with HCS/HR, Mr. Lohabare traveled extensively to provide services for clients at their homes and Defendants did not compensate Mr. Lohabare for the time he spent performing this task.

35. Mr. Lohabare traveled in his personal vehicle to provide services for clients of HCS/HR at their homes.

36. Throughout his employment with HCS/HR, Mr. Lohabare traveled extensively to provide services for clients at their homes, and HCS/HR did not reimburse Mr. Lohabare for his mileage, despite Mr. Lohabare's requests for such reimbursement.

### *Defendants' Misclassification of Plaintiff*

37. Plaintiff was hired by HCS/HR in or around June of 2014.

38. Defendant Hayden, on information and belief, was personally involved in hiring Mr. Lohabare.

39. On or around July of 2014, HCS submitted a Labor Condition Application ("LCA") prepared by Mr. Hayden and reviewed by Lamboley to the United States Citizenship

and Immigration Services Field Office in St. Albans, Vermont, attached hereto as Exhibit B, to extend Mr. Lohabare's H-1B work visa for his employment at HCS/HR.

40. Under the H-1B program, an individual provided an H1-B visa must work as an employee for the sponsor company.

41. As is required by an LCA and in explicit terms within the LCA, HCS/HR attested that Mr. Lohabare, the H-1B visa applicant, would work as an employee for HCS/HR, the sponsor company.

42. Specifically, Mr. Hayden signed a certification stating HCS/HR would maintain a "valid, employer-employee relationship with [Mr. Lohabare] at all times."

43. In the LCA, Mr. Hayden further attested that Mr. Lohabare would be paid by HCS the proposed wage of sixty dollars ($60.00) per hour.

44. In the LCA, Mr. Hayden attested that Mr. Lohabare would be paid an annual salary of $99,840.00 per year by HCS/HR.

45. In Part D of the LCA, Mr. Hayden indicated that Mr. Lohabare would not be assigned to work at an off-site location for all or part of the period for which H-1B classification was sought.

46. In making this indication, Mr. Hayden, under the terms of the LCA and corresponding law, would not be required to pay Mr. Lohabare a wage higher than the prevailing wage rate for work conducted at an off-site location.

47. Despite this certification, Mr. Lohbare's position with Defendants was that of a physical therapist performing home health care services; in short, a person who worked exclusively at off-site locations, contrary to Mr. Hayden's certification in the LCA.

48. On the LCA, Mr. Hayden represented the gross annual income of HCS/HR as being $1,600,000.00, with a net annual income of $150,000.00.

49. Mr. Hayden signed the verification page of the LCA and indicated, under penalty of perjury, that the information in the LCA was true and correct to the best of his knowledge on June 16, 2014.

50. On or about June 20, 2014, Mr. Hayden provided Mr. Lohabare with the Employment Agreement that classified Mr. Lohabare's work as that of an independent contractor.

51. The Employment Agreement, contrary to the LCA, provided that Mr. Lohabare's compensation would be based upon the number of patients he visited.

52. Mr. Lohabare signed the Employment Agreement on June 20, 2014, and Mr. Hayden signed the Employment Agreement on June 21, 2014.

53. On July 8, 2014, Lamboley, on behalf of the Lamboley Law Office, LLC and acting as a representative of HCS/HR, signed the verification page of the LCA indicating that he had prepared and reviewed the form, and that the information contained therein was true and correct to the best of his knowledge.

54. Following the hire of Mr. Lohabare by HCS/HR, HCS/HR failed to compensate Mr. Lohabare for his work at an hourly or salaried rate.

55. HCS calculated/HR Mr. Lohabare's amount of pay based on the number of patients he visited.

56. The method of wage payment utilized by Defendants resulted in compensation to Mr. Lohabare substantially less than the sixty dollars ($60.00) per hour proposed rate submitted on the LCA.

57.     The method of wage payment utilized by Defendants resulted in compensation to Mr. Lohabare substantially less than the $99,840.00 annual salary provided for in the LCA.

*Failure to Timely Pay and Failure to Pay*

58.     On nearly every occasion on which a paycheck was due to Mr. Lohabare throughout the duration of his employment, HCS/HR failed to timely pay Mr. Lohabare in violation of District of Columbia and federal law.

59.     On or about the following dates, HCS/HR failed to provide a paycheck to Mr. Lohabare on the date it was due. Such occasions include, but are not limited to: November 21, 2014; December 5, 2014; January 19, 2015; January 30, 2015; February 13, 2015; March 6, 2015; March 20, 2015; May 1, 2015; May 15, 2015; May 30, 2015; June 12, 2015; June 16, 2015; July 10, 2015; August 7, 2015; August 21, 2015; October 16, 2015; November 1, 2015; November 17, 2015, and December 25, 2015.

60.     On nearly every occasion on which a paycheck was due to Mr. Lohabare and he received the paycheck late, HCS/HR asked Mr. Lohabare to wait an additional period of time before depositing or cashing the delayed paycheck.

61.     On numerous occasions throughout his employment, paychecks issued to Mr. Lohabare by HCS/HR were returned for insufficient funds.

62.     On or about the following dates, a paycheck issued by HCS/HR to Mr. Lohabare was returned for insufficient funds. Such occasions include, but are not limited to: December 27, 2014; February 28, 2015; April 21, 2015; May 30, 2015; June 15, 2015; August 7, 2015; October 16, 2015; November 1, 2015; November 16, 2015; and November 27, 2015.

63.     In response to Mr. Lohabare's numerous stated concerns about Defendants failure to compensate him on time or at all, Defendants provided Mr. Lohabare with assurances that the problems he had encountered would soon be resolved.

64.     On more than one occasion on which Mr. Lohabare informed Mrs. Hayden he had not received a paycheck, Mrs. Hayden informed Mr. Lohabare the check had already been sent to him, that he should have already received it, or that it was in the mail.

65.     Upon information and belief, Mrs. Hayden's statements to Mr. Lohabare were not truthful but were intended to delay Mr. Lohabare from seeking the compensation owed to him by Defendants.

66.     On more than one occasion on which Mr. Lohabare informed Mrs. Hayden a paycheck he had received had been returned for insufficient funds, Mrs. Hayden informed Mr. Lohabare that HCS/HR was experiencing financial difficulties and lacked adequate funds to pay Mr. Lohabare.

67.     Mrs. Hayden's statements to Mr. Lohabare are inconsistent with the representations made by HCS/HR on the LCA for Mr. Lohabare in regard to the gross and net annual income of HCS/HR.

68.     On April 2, 2015, Mrs. Hayden sent Mr. Lohabare a text message about two missing paychecks, stating "I am overnighting you your checks deposit one immediately and deposit the other on Thursday sending out the package right now."

69.     Mr. Lohabare did not receive these checks until April 8, 2015, and upon attempting to deposit the first paycheck as instructed, it was returned to him due to insufficient funds.

70. On April 23, 2015, Mrs. Hayden indicated to Mr. Lohabare via text message that she was in the middle of a court case that was about to settle, and that within the next week there would be "no more money worries."

71. On July 17, 2015, Mrs. Hayden sent Mr. Lohabare a text message regarding his paycheck due to him on July 10, 2015, stating "Do not deposit your check tomorrow. As soon as we receive a payment next week you are the first check cashed."

72. On July 21, 2015, Mr. Lohabare informed Mrs. Hayden that he had still not received his paycheck due to him on July 10, 2015, and was still unable to cash the paycheck due to him on June 26, 2015.

73. On or about November 24, 2015, in response to Mr. Lohabare's concern about three or more missing paychecks, Scheminant sent Mr. Lohabare a text message stating "you are almost all caught up."

74. The paychecks HCS/HR issued to Mr. Lohabare that were returned for insufficient funds for August 7, 2015; October 16, 2015; November 1, 2015; and November 27, 2015 were never re-issued by Defendants and never cleared.

75. Mr. Lohabare retained a physical copy of these four (4) checks in his possession.

76. In addition, HCS/HR stopped payment on the check due to Mr. Lohabare on December 25, 2015 after Mr. Lohabare had deposited the check, but before the check had cleared.

77. HCS/HR never re-issued this check, and Mr. Lohabare never received the compensation HCS/HR owed to him for the paycheck due on December 25, 2015.

78. Problems with the timely payment and return of Mr. Lohabare's paychecks continued from December 2015 until March 2016.

79.    On December 11, 2015, Scheminant responded to Mr. Lohabare's concerns about his pay via text message, stating "After the 15th payroll will be backed by the new investor – you won't have to worry and we can get your past due checks thru [sic]."
Scheminant knew that this statement was not true, and that Mr. Lohabare would not be receiving payment for the past paychecks he had never received.

80.    Scheminant instructed Mr. Lohabare to return the physical copies of the paychecks that had not cleared from August 7, 2015, October 16, 2015, November 1, 2015, and November 27, 2015.

81.    Upon information and belief, Mr. Hayden and Mrs. Hayden instructed Scheminant to collect these paychecks from Mr. Lohabare to ensure that Mr. Lohabare did not attempt to receive payment on them.

82.    Mr. Lohabare returned the physical copies of these checks to Scheminant.

83.    Scheminant offered to provide payment to Mr. Lohabare for the August 7, 2015 paycheck by separating the total amount, $4,366.00, into two separate checks.

84.    Scheminant wrote one of these checks in the amount of $2,136.00 and the other in the amount of $2,230.00.

85.    Scheminant provided Mr. Lohabare with the check for $2,136.00, which Mr. Lohabare was informed he could deposit.

86.    Scheminant maintained physical possession of the remaining check for $2,230.00.

87.    Scheminant did not provide payment to Mr. Lohabare for the October 16, 2015, November 1, 2015, or November 27, 2015 paychecks, and did not return the physical copies of these paychecks to Mr. Lohabare.

*Unlawful Deductions and Conversion*

88. At the end of tax year 2014, as a result of the misclassification by HCS/HR of Mr. Lohabare's employment, Mr. Lohabare received a Form 1099 rather than a Form W-2 for the year.

89. Mr. Lohabare expressed his concerns to HCS/HR about not receiving his W-2 and the potential implications the non-receipt of his W-2 would have on his H-1B status on this and multiple other occasions throughout his employment.

90. In or around November 2015, Mr. Lohabare contacted Lamboley via telephone to inquire about changing his employment classification so that he may receive a W-2.

91. During this conversation, Lamboley told Mr. Lohabare he could not work as a contractor on an H-1B visa, confirming Mr. Lohabare's fears.

92. During this conversation, Lamboley informed Mr. Lohabare that Lamboley was already aware of the misclassification problem, and had discussed correcting Mr. Lohabare's employment classification with Scheminant.

93. On or around November 23, 2015, Scheminant also informed Mr. Lohabare via text message, "we are converting you to W2 [sic] soon. I talked to [Mr. Hayden] and [Lamboley]."

94. In December 2015, Mr. Lohabare, concerned that the problem had not yet been corrected, called Lamboley once again to discuss his need for a W-2 and correction of his employment classification by reason of his H-1B status.

95. In or around January of 2016, HCS/HR informed Mr. Lohabare of its intent to retroactively change his employment classification from that of an independent contractor to that of an employee.

96.     Mrs. Hayden informed Mr. Lohabare that he would begin to receive his pay as a salaried employee in January of 2016.

97.     Defendants did not provide Mr. Lohabare with a Form W-4 for his completion until January 2016, and therefore Mr. Lohabare had no opportunity prior to January 2016 to indicate the appropriate number of federal deductions to apply to his withholding.

98.     Defendants did not provide Mr. Lohabare with a Form VA-4 for his completion until January 2016, and therefore Mr. Lohabare had no opportunity prior to January 2016 to indicate the appropriate number of state deductions to apply to his withholding.

99.     On January 20, 2016, Mr. Lohabare informed Mr. Hayden via email, attached as Exhibit C, that Scheminant was still in possession of four paychecks belonging to him for which he had never received payment: the remaining portion of his paycheck from August 7, 2015, the paycheck from October 16, 2015, the paycheck from November 1, 2015, the paycheck from November 27, 2015, as well as the paycheck due to him on December 25, 2015.

100.    Mr. Hayden responded to Mr. Lohabare's concerns about missing paychecks via email, asking Mr. Lohabare how much he was owed and informing him "We have a new investor and will get all this taken care of . . .".

101.    Upon information and belief, Mr. Hayden knew that this statement was not true, and that Mr. Lohabare would not be receiving payment for the past paychecks he had never received.

102.    Mr. Lohabare's paystub from HCS/HR for the pay period beginning on January 25, 2016 and ending on February 7, 2016, attached as Exhibit D, reflect the amount of taxes withheld from the pay period as $239.68, with an additional amount of $1,222.92 withheld as "repay," resulting in a net payment to Mr. Lohabare of $0.00.

103. Mr. Lohabare's paystub from HCS/HR for the pay period beginning on February 8, 2016 and ending on February 21, 2016, attached as Exhibit E, reflect the amount of taxes withheld from the pay period as $652.36, with an additional amount of $1,701.08 withheld as "repay," resulting in a net payment to Mr. Lohabare of $569.64.

104. On February 22, 2016, after having not received several paychecks, Mr. Lohabare sent Scheminant a text message inquiring about his pay.

105. Scheminant told Mr. Lohabare there was a problem with direct deposit and offered to write Mr. Lohabare a check.

106. Mr. Lohabare responded that a hand-written check was not sufficient, as he needed to submit a paystub in order to continue receiving WIC benefits for his son.

107. Scheminant wrote Mr. Lohabare a check on or about February 22, 2016 and provided Mr. Lohabare with only a handwritten pay stub, attached as Exhibit F.

108. On March 15, 2016, Mr. Lohabare informed Scheminant of his intent to resign from employment.

109. In an email to Mr. Lohabare dated March 16, 2016, attached as Exhibit G, HCS/HR informed Mr. Lohabare that the entirety of the three paychecks that had never cleared from the previous year: those from October 16, 2015, November 1, 2015, and November 27, 2015, were being applied toward the amount of taxes that should have been withheld from his paychecks during the tax year 2015.

110. In this email, Mr. Hayden represented to Mr. Lohabare that the total amount of tax that should have been withheld from Mr. Lohabare's paychecks for the year 2015 was almost exactly equal to the total amount of Mr. Lohabare's three returned paychecks that had never cleared, or $9,015.80.

111.  Scheminant and Petry were copied on this email communication.

112.  In addition, HCS/HR informed Mr. Lohabare that the entirety of his paycheck from December 25, 2015 that did not clear would be applied to the taxes they had failed to withhold during the first month of 2016.

113.  HCS/HR, as employer of Mr. Lohabare, was a withholding agent responsible for withholding tax from all payments made to Mr. Lohabare at the time such payments were made.

114.  HCS/HR failed to provide Mr. Lohabare with a Form W-2 for the tax year 2015 until approximately mid-March of 2016.

115.  Instead, HCS/HR emailed Mr. Lohabare a "preview" of a payroll printout indicating Mr. Lohabare's gross and net pay for 2015, attached as Exhibit H.

116.  Both the informal statement of Mr. Lohabare's gross and net pay and the W-2 eventually issued to Mr. Lohabare by HCS/HR, attached as Exhibit I, overstated the amount paid to Mr. Lohabare for the year 2015 by an amount of approximately $20,000.00.

117.  In an effort to retain Mr. Lohabare as an employee, HCS/HR provided Mr. Lohabare with two offer letters, dated March 18, 2016 and March 22, 2016, respectively, which outlined proposed compensation and benefits for Mr. Lohabare going forward.

118.  The offer letter dated March 18, 2016, attached as Exhibit J, provided a base salary to Mr. Lohabare of $90,000.00 annually, eligibility for medical benefits, paid time off at a rate of 3.7 hours per pay period, 401K participation, mileage reimbursement, and a continuing education allowance.

119.  The offer letter dated March 22, 2016, attached as Exhibit K, provided HCS/HR would "continue to support [Mr. Lohabare] in [his] desire to obtain permanent U.S. residency via

obtaining [his] Green Card -through EB1 filing. The EB1 will further be filed on a 'fast track' 'premium' basis, at the company's cost to accelerate the process."

120. This letter further stated that Lamboley had been retained by HCS/HR to complete Mr. Lohabare's legal permanent resident ("green card") filing, and that because Prevailing Wage studies and Internal Job posting requirements had already been completed by the prior company, "no one can get the job done faster than we can."

121. The March 22, 2016 letter also provided for reimbursement to Mr. Lohabare for mileage from 2015, continuing education costs from 2015, licensure filing fees from 2015, and continued reimbursement of these fees and costs going forward.

122. Mr. Lohabare re-expressed his intent to resign from his employment with HCS/HR on March 22, 2016.

123. On March 30, 2016, Mr. Lohabare sent Scheminant a text message to inquire about his final paycheck, due to him on March 30, 2016.

124. Scheminant responded via text, "I told you earlier that you needed to give us 30 days [notice] or you breach your contract and forfeit any monies."

125. The Employment Agreement signed by Mr. Lohabare does not make any reference to forfeiture of pay based on a failure to provide thirty days of notice prior to resigning from employment.

126. Scheminant never told Mr. Lohabare, either in writing or orally, that he needed to give thirty days of notice prior to resigning from employment.

127. Mr. Lohabare never received his final paycheck from HCS/HR.

*Negligent and Fraudulent Misrepresentations: Immigration Documents*

128.  Prior to Mr. Lohabare starting work with HCS/HR, HCS/HR represented to Mr. Lohabare their willingness and ability to assist him with the processing of his green card application once he started working.

129.  HCS/HR repeatedly ignored Mr. Lohabare's attempts to obtain his green card throughout the duration of his employment.

130.  In the first several months of Mr. Lohabare's employment, Mr. Lohabare asked Mrs. Hayden for an update on the status of his green card application, and Mrs. Hayden assured him that Mr. Hayden and Lamboley were working on it.

131.  On or around May 11, 2015, Mrs. Hayden notified Mr. Lohabare via text message that "[Mr. Hayden] has a meeting with the attorney regarding your green card."

132.  Upon information and belief, Lamboley is the attorney referenced in this communication.

133.  Around this time, Mr. Lohabare, on his wife's behalf, sent an I-140 application to Mr. Hayden to be forwarded to Lamboley for review.

134.  Mr. Lohabare's wife, by virtue of her status as an H-4 visa holder, could not seek employment in the United States unless the I-140 application was submitted and approved.

135.  On August 11, 2015, Mr. Lohabare asked Scheminant about the progress that had been made on his green card application.

136.  On August 14, 2015, Scheminant informed Mr. Lohabare that his green card application was being processed.

137. On September 8, 2015, Mr. Lohabare spoke to Mrs. Hayden about the I-140 application he had submitted and reminded her of the importance of the application due to his current financial situation.

138. On or about October 19, 2015 Mr. Lohabare inquired with Scheminant about the status of the I-140 application Mr. Lohabare had previously submitted to Hayden.

139. On this date, Scheminant informed Mr. Lohabare she would reach out to Lamboley to ask him about the status of the application.

140. Mr. Lohabare again explained the importance of the application to Scheminant, as Mr. Lohabare was the sole provider for his wife and child, and was not receiving enough pay from Defendants to support them on his own.

141. On or about October 19, 2015 Scheminant asked Mr. Lohabare if he wanted Lamboley's help with the I-140 application.

142. Mr. Lohabare confirmed that he did want Lamboley's assistance and stated his willingness to pay any applicable fees.

143. On or about October 21, 2015, Scheminant informed Mr. Lohabare that she had spoken to Lamboley about Mr. Lohabare's green card application, and that Lamboley was filing the application under the "EB2" category.

144. Scheminant added that she had informed Lamboley that Mr. Lohabare was listed as a director on the company website.

145. On or around November 23, 2015, Mr. Lohabare asked Scheminant about the delay in processing his green card application.

146. Scheminant responded that she had reached out to Lamboley, and the delay was due to the application being filed under the "EB2" rather than the "EB3" category.

147. On December 18, 2015, Mr. Lohabare asked Mrs. Hayden if there had been any progress on his green card application.

148. Mrs. Hayden responded via text message, "I have not I have no idea what to do," followed by "I need you and [Mr. Hayden] to handle this I am swamped."

149. On or about January 25, 2016, Mr. Lohabare once again inquired with Scheminant about the status of the I-140 application.

150. Scheminant did not respond to Mr. Lohabare's inquiry.

151. On or about February 4, 2016, Mr. Lohabare once again contacted Scheminant to ask if she knew whether Mr. Hayden had ever forwarded the I-140 application to Lamboley.

152. Scheminant responded, "I believe so- but email him bc [sic] I'm not sure."

153. On or about February 8, 2016, Scheminant sent Mr. Lohabare a text message stating "I am signing and sending back your I-140 papers to [Lamboley]."

154. On or about March 8, 2016, Mr. Lohabare once again contacted Scheminant to inquire about the status of the I-140 application.

155. Scheminant responded, "Don't bombard [Lamboley]- I'll deal with him."

156. Mr. Lohabare never received the I-140 document, or any additional update on the status of his I-140 application from HCS/HR throughout the duration of his employment. Upon information and belief, HCS/HR never initiated processing of Mr. Lohabare's green card application.

*Retaliation*

157. On or about August 15, 2016, Mr. Lohabare, through counsel, contacted HCS/HR through its counsel, Lamboley, to resolve the instant matter.

158. Through this communication, HCS/HR became aware of the nature of Mr. Lohabare's claims.

159. On or about October 27, 2016, Mr. Lohabare requested employment verification from HCS/HR.

160. Mr. Lohabare requested employment verification, through counsel, as part of his effort to become a legal permanent resident in the United States.

161. An individual seeking to become a legal permanent resident must provide employment verification from each former employer in the United States.

162. Mr. Lohabare, through counsel, sent a sample employment verification, attached hereto as Exhibit L, to counsel for HCS/HR.

163. Lamboley stated by email on November 3, 2016, "Tim [Petry] said yes he should be able to get an employment verification letter for [Mr. Lohabare]."

164. On November 16, 2016, Mr. Lohabare, through counsel, reached out to counsel for HCS/HR again regarding the employment verification.

165. Lamboley, counsel for HCS/HR, responded on that same day that he would follow up.

166. Subsequently, neither HCS/HR nor its counsel provided an employment verification for Mr. Lohabare.

167. HCS/HR only became unwilling to provide Mr. Lohabare with an employment verification after it became apparent that this matter would not settle before litigation.

168. Specifically, HCS/HR only became unwilling to provide Mr. Lohabare with an employment verification after it became clear that Mr. Lohabare would file the instant lawsuit against them to recover unpaid wages, unpaid benefits, and other remedies.

169. This was a retaliatory act in violation of District of Columbia and federal law.

170. As of the date of this filing, HCS/HR has not provided Mr. Lohabare with the verification of his employment.

**COUNT I**
**Actual Fraud**
**In Violation of Virginia Common Law**
*Against All Defendants*

171. Plaintiff re-alleges and reasserts each and every allegation set forth above, as if each were set forth herein.

172. Throughout Mr. Lohabare's employment, HCS/HR repeatedly represented to Mr. Lohabare that he would be reasonably compensated for his work and in compliance with the regulations pertaining to his H-1B classification.

173. Mr. Hayden represented in the LCA for Mr. Lohabare that HCS/HR would, at all times, uphold the requisite employer-employee relationship for Mr. Lohabare as a beneficiary of an H-1B visa.

174. At the time Mr. Hayden made these representations, Mr. Hayden knew they were false and intended only to hire Mr. Lohabare as an independent contractor.

175. Lamboley represented in the LCA that the information provided by Mr. Hayden was true and accurate to the best of his knowledge.

176. Upon information and belief, Mr. Lohabare had already signed the Employment Agreement with HCS/HR that classified him as an independent contractor, and Lamboley knew, or should have known, that Mr. Hayden's statements in the LCA to the contrary were false.

177. In response to concerns voiced by Mr. Lohabare about the method of wage payment utilized by Defendants, Scheminant told Mr. Lohabare via text, "we will not let you lose your status."

178.  On numerous occasions during Mr. Lohabare's employment, Mrs. Hayden assured Mr. Lohabare that delays in the receipt of his paychecks would not continue into the future, and provided him with various reasons why the problem would not continue.

179.  Upon information and belief, Mrs. Hayden knew or should have known that the reasons she provided to Mr. Lohabare to reassure him about his future pay were false.

180.  On numerous occasions during Mr. Lohabare's employment, Mrs. Hayden represented to Mr. Lohabare that financial problems prevented HCS from compensating Mr. Lohabare in full and in a timely manner.

181.  Upon information and belief, Mrs. Hayden knew or should have known that this information was false.

182.  On numerous occasions during Mr. Lohabare's employment, Scheminant assured Mr. Lohabare that delays in the receipt of his paychecks would not continue, and provided him with various reasons why the problem would not continue.

183.  Upon information and belief, Scheminant knew or should have known that the reasons she provided Mr. Lohabare to reassure him of his future pay were false.

184.  Scheminant collected the physical copies of the paychecks retained by Mr. Lohabare that had been returned for insufficient funds with the representation Mr. Lohabare would receive payment for these paychecks.

185.  Scheminant knew or should have known that Mr. Lohabare would not receive payment on these paychecks, and her collection of the paychecks was intended to deprive Mr. Lohabare of the compensation owed to him by HCS/HR.

186. Defendants knew that Mr. Lohabare's misclassification as an independent contractor was in violation of regulations pertaining to his H-1B classification and jeopardized his H-1B worker status.

187. Defendants knew that delays in Mr. Lohabare's receipt of his paychecks would continue to occur, despite numerous intentional misrepresentations to the contrary.

188. Defendants made these misrepresentations with the intent to deceive Mr. Lohabare to ensure his continued employment without the need to compensate him at the rate required by law and in the manner required by law, or provide him other benefits of employment to which he was legally entitled.

189. Mr. Lohabare relied on Defendants' misrepresentations concerning his compensation, benefits, and H-1B worker status in choosing to remain employed with HCS/HR.

190. Mr. Lohabare relied on Defendants' misrepresentations by providing the physical copies of the paychecks he retained that had been returned for insufficient funds to Scheminant.

191. Mr. Lohabare suffered financial harm as a result of Defendants' actions and misrepresentations.

192. As a result of Defendants' actions, Mr. Lohabare is entitled to compensatory damages in an amount to be determined at trial, interest (both pre- and post-judgment), and any other relief this Court deems appropriate.

193. As Defendants acted with actual malice and made these misrepresentations with the intent of injuring Mr. Lohabare, Mr. Lohabare is further entitled to punitive damages.


**COUNT II**
**Conspiracy to Commit Fraud**
**In Violation of Virginia Common Law**
*Against All Defendants*

194. Plaintiff re-alleges and reasserts each and every allegation set forth above, as if each were set forth herein.

195. As alleged herein, upon information and belief, Defendants knowingly conspired with each other to engage in fraudulent activities in order to deprive Mr. Lohabare of the payment and benefits due to him by virtue of his employment.

196. Mr. Lohabare relied on Defendants' intentional misrepresentations concerning his compensation, benefits, and H-1B worker status in choosing to remain employed with HCS/HR.

197. Scheminant collected the physical copies of the paychecks retained by Mr. Lohabare that had been returned for insufficient funds by making the misrepresentation to Mr. Lohabare that he would receive payment for these paychecks.

198. Scheminant knew or should have known that Mr. Lohabare would not receive payment on these paychecks, and her collection of Mr. Lohabare's paychecks was intended to deprive Mr. Lohabare of the compensation owed to him by Defendants.

199. Defendants made these misrepresentations with the intent to deceive Mr. Lohabare so as to ensure his continued employment without the need to compensate him at the rate required by law and in the manner required by law, or provide him other benefits of employment to which he was legally entitled.

200. Upon information and belief, Scheminant was instructed by Mr. Hayden and Mrs. Hayden to recover the physical copies of these paychecks from Mr. Lohabare for the purpose of depriving Mr. Lohabare of the compensation owed to him by Defendants.

201. Mr. Lohabare relied on Defendants' misrepresentations by providing the physical copies of the paychecks he retained that had been returned for insufficient funds to Scheminant.

202.  Mr. Lohabare suffered financial harm as a result of Defendants' actions and misrepresentations.

203.  As a result of Defendants' actions, Mr. Lohabare is entitled to compensatory damages in an amount to be determined at trial, interest (both pre- and post-judgment), and any other relief this Court deems appropriate.

204.  As Defendants acted with actual malice and made these misrepresentations with the intent of injuring Mr. Lohabare, Mr. Lohabare is further entitled to punitive damages.

**COUNT III**
**Constructive Fraud**
**In Violation of Virginia Common Law**
*Against All Defendants*

205.  Plaintiff re-alleges and reasserts each and every allegation set forth above, as if each were set forth herein.

206.  Defendants negligently communicated false information to Mr. Lohabare concerning his compensation and important matters related to important immigration documents for both himself and his wife.

207.  In making these misrepresentations, Defendants should have at the very least recognized that Mr. Lohabare would be imperiled by action taken in reliance on the false information.

208.  Mr. Lohabare relied on the false information and misrepresentations provided to him by Defendants, and was financially harmed by his reliance on Defendants' statements.

209.  As a result of Defendants' actions, Mr. Lohabare is entitled to compensatory damages in an amount to be determined at trial, interest (both pre- and post-judgment), and any other relief this Court deems appropriate.

**COUNT IV**

**Conversion**
**In Violation of Virginia Common Law**
*Against All Defendants*

210.    Plaintiff re-alleges and reasserts each and every allegation set forth above, as if each were set forth herein.

211.  HCS/HR demanded Mr. Lohabare return several of his paychecks, which had been provided to Mr. Lohabare over a series of months in compensation for his employment.

212.  The paychecks Mr. Lohabare was forced to return to HCS/HR were Mr. Lohabare's personal property and were within his lawful possession.

213.  HCS/HR unlawfully exercised ownership, dominion, or control of Mr. Lohabare's paychecks by seizing the paychecks, denying him the monetary value of the instruments, and instead utilizing the monetary value of the instruments to its own benefit.

214.  In so doing, Defendants denied and repudiated Mr. Lohabare's rights in regard to the paychecks he had earned and the compensation he was legally entitled to from HCS/HR.

215.  As a result of Defendants' actions, Mr. Lohabare is entitled to compensatory damages in an amount to be determined at trial, interest (both pre- and post-judgment), and any other relief this Court deems appropriate.

216.  Due to the willful, wanton, and malicious nature of Defendants' actions, Mr. Lohabare is further entitled to punitive damages.

**COUNT V**
**Breach of Contract**
**In Violation of the Common Law of the District of Columbia**
*Against Defendants Petry, Mr. Hayden, and Home Recovery*

217.  Plaintiff re-alleges and reasserts each and every allegation set forth above, as if each were set forth herein.

26

218.     Mr. Lohabare, upon beginning work for Defendants, accepted the offer of

employment from HCS/HR under the terms and conditions of the Employment Agreement.

219.     Despite Defendants' misclassification of Plaintiff as an independent contractor,

these terms and conditions provide for compensation to Mr. Lohabare as an employee of

HCS/HR.

220.  Mr. Lohabare accepted and signed the Employment Agreement on June 20, 2014.

221.  Mr. Hayden, on behalf of HCS/HR, accepted and signed the Employment

Agreement on June 21, 2014.

222.  Paragraph 2A of the Employment Agreement provides:

 In consideration of the Services to be performed by [Mr. Lohabare] under this
Agreement [HCS/HR] will pay [Mr. Lohabare] the flat rate (see Exhibit A). [Mr.
Lohabare] shall submit written, signed invoices of the time spent performing
Consulting Services, itemizing in reasonable detail the dates on which services
were performed, and a brief description of the services rendered. [HCS/HR] shall
pay [Mr. Lohabare] the amounts due pursuant to submitted reports within 10 days
after such invoices are received by Company.

223.     Exhibit A to the Employment Agreement provides for payment by HCS/HR to

Mr. Lohabare for services to HCS/HR clients, with compensation to Mr. Lohabare ranging from

$63.00 to $85.00 per service, depending on the type of service provided.

224.     Throughout the duration of Mr. Lohabare's employment at HCS/HR, Mr.

Lohabare submitted invoices for the work he completed in accordance with the specifications

provided in the Employment Agreement.

225.     On at least four occasions, HCS/HR failed to pay Mr. Lohabare any compensation

for the amount due to him by HCS/HR pursuant to the invoices he submitted.

226.     On at least nineteen occasions, HCS/HR failed to pay Mr. Lohabare the compensation due to him by HCS/HR pursuant to the invoices he submitted within ten (10) days following his submission of his invoice.

227.     Each failure by HCS/HR to provide payment to Mr. Lohabare in accordance with the Employment Agreement constituted a material breach of the agreement.

228.     Paragraph 3A of the Employment Agreement provides, in relevant part, "It is understood that [HCS/HR] will not withhold any amounts for payment of taxes from the compensation of [Mr. Lohabare] hereunder."

229.     HCS/HR retroactively deducted taxes from Mr. Lohabare's pay for the period of time HCS/HR misclassified Mr. Lohabare as an independent contractor.

230.     The retroactive deduction of taxes by HCS/HR in contravention of the Employment Agreement constituted a material breach of the agreement.

231.     As a result of Defendants' breach, Mr. Lohabare is entitled to the agreed-upon compensation from HCS/HR that remains unpaid, in an amount to be determined at trial.

### COUNT VI
### Failure to Pay Overtime
### In Violation of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*
### *Against Defendants Petry, Mr. Hayden, and Home Recovery*

232.     Plaintiff re-alleges and reasserts each and every allegation set forth above, as if each were set forth herein.

233.  At all times relevant to this action, Plaintiff was employed by Petry, Mr. Hayden, and HCS/HR within the meaning of the FLSA, and is entitled to the rights, protections, and benefits provided under the FLSA.

234.  Section 207(a)(1) of the FLSA provides that "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives

compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

235. Plaintiff was not an exempt employee.

236. Petry, Mr. Hayden, and HCS/HR knowingly violated the FLSA by knowingly failing to compensate Plaintiff for all hours worked, including compensation at the rate of time-and-one-half (1.5) his regular hourly rate for every hour worked in excess of forty (40) hours in any one workweek.

237. The violations of the FLSA by Petry, Mr. Hayden, and HCS/HR were repetitive, willful, intentional, and in bad faith.

238. Petry, Mr. Hayden, and HCS/HR are liable to Plaintiff under the FLSA, § 216(b), for all unpaid wages and overtime wages, in an amount to be determined at trial, plus an equal amount in liquidated damages, interest (both pre- and post-judgment), attorneys' fees, costs, and any other relief this Court deems appropriate.

**COUNT VII**
**Retaliation**
**In Violation of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.***
***Against Defendants Petry, Mr. Hayden, and Home Recovery***

239. Plaintiff re-alleges and reasserts each and every allegation set forth above, as if each were set forth herein.

240. At all times relevant to this action, Plaintiff was employed by Petry, Mr. Hayden, and HCS/HR within the meaning of the FLSA, and is entitled to the rights, protections, and benefits provided under the FLSA.

241. Section 215(a)(3) of the FLSA provides that "it shall be unlawful for any person . . . to discharge or in any other manner discriminate against any employee because such employee

has filed a complaint or instituted or caused to be instituted any proceeding under or related to this chapter. . .".

242. On or about August 15, 2016, Plaintiff sent a demand letter to HCS/HR.

243. At this time, Petry, Mr. Hayden, and HCS/HR became aware of Plaintiff's allegations of violations of the Fair Labor Standards Act and other applicable laws.

244. Petry, Mr. Hayden, and Home Recovery violated the FLSA by failing to provide employment verification for Mr. Lohabare for the purpose of obtaining his green card after learning Mr. Lohabare had complained of the violations of the FLSA by Petry, Mr. Hayden, and HCS/HR.

245. Specifically, Petry, Mr. Hayden, and Home Recovery immediately became unwilling to provide employment verification for Mr. Lohabare after Mr. Lohabare declined to settle this matter.

246. Petry, Mr. Hayden, and Home Recovery thereby retaliated against Mr. Lohabare in response to his complaints regarding Defendants' failure and refusal to abide by the FLSA.

247. Petry, Mr. Hayden, and Home Recovery are liable to Plaintiff under the FLSA, § 216(b), for all wages lost as a result of their willful refusal to verify his employment, in an amount to be determined at trial, plus an equal amount in liquidated damages, punitive damages, interest (both pre- and post-judgment), attorneys' fees, costs, and any other relief this Court deems appropriate.

**COUNT VIII**
**Failure to Pay Overtime**
**In Violation of the DC Minimum Wage Act, D.C. Code Ann. § 32-1001 *et seq.***
***Against Defendants Petry, Mr. Hayden, and Home Recovery***

248. Plaintiff re-alleges and reasserts each and every allegation set forth above, as if each were set forth herein.

249. At all times relevant to this action, Plaintiff was employed by HCS/HR within the meaning of the DCMWA, D.C. Code Ann. § 32-1002, and is entitled to the rights, protections, and benefits provided under the DCMWA.

250. Section 32-1003(c) of the DCMWA provides that "[n]o employer shall employ any employee for a workweek that is longer than 40 hours, unless the employee receives compensation to employment in excess of 40 hours at a rate not less than 1.5 times the regular rate at which the employee is employed."

251. Plaintiff was not an exempt employee.

252. Petry, Mr. Hayden, and HCS/HR violated the DCMWA by knowingly failing to compensate Plaintiff for all hours worked, including compensation at the rate of time-and-one-half (1.5) his regular hourly rate for every hour worked in excess of forty (40) hours in any one workweek.

253. Petry, Mr. Hayden, and HCS/HR knew or should have known its acts or omissions were in violation of the DCMWA.

254. By their actions alleged herein, Petry, Mr. Hayden, and HCS/HR willfully violated the DCMWA's provisions for the payment of all wages for labor and services rendered, including overtime wages for employment in excess of forty (40) hours per week.

255. Petry, Mr. Hayden, and HCS/HR are liable to Plaintiff under DCMWA, § 32-1012, for all unpaid wages and overtime wages in an amount to be determined at trial, plus an equal amount in liquidated damages, interest (both pre- and post-judgment), attorneys' fees, costs, and any other relief this court deems appropriate.

**COUNT IX**
**Unpaid Wages and Unlawful Deductions**
**In Violation of the D.C. Wage Payment and Collection Law**
**D.C. Code Ann. § 32-1301 *et seq*.**

*Against Defendants Petry, Mr. Hayden, and Home Recovery*

256. Plaintiff re-alleges and reasserts each and every allegation set forth above, as if each were set forth herein.

257. At all times relevant to this action, Plaintiff was employed by Petry, Mr. Hayden, and HCS/HR within the meaning of the DCWPCL, D.C. Code Ann. § 32-1301, et seq., and is entitled to the rights, protections, and benefits provided under the DCWPCL.

258. Petry, Mr. Hayden, and HCS/HR failed to timely pay Plaintiff his promised and required wage rate for all hours worked in violation of the DCWPCL § 32-1302.

259. Petry, Mr. Hayden, and HCS/HR failed to timely pay Plaintiff the overtime premium owed to him by law under the FLSA and DCMWA in violation of the DCWPCL § 32-1302.

260. Petry, Mr. Hayden, and HCS/HR made unlawful deductions from Plaintiff's earned wages and thus failed to pay Plaintiff his promised and required wages rate in violation of the DCWPCL § 32-1302.

261. The violations of the DCWPCL by Petry, Mr. Hayden, and HCS/HR were repetitive, willful, intentional, and in bad faith.

262. Petry, Mr. Hayden, and HCS/HR are liable to Plaintiff under the DCWPCL, § 32-1308 for his unpaid wages, in an amount to be determined at trial, liquidated damages, interest (both pre- and post-judgment), attorneys' fees, costs, and any other and further relief this Court deems appropriate.

**COUNT X**
**Retaliation**
**in Violation of the D.C. Wage Payment and Collection Law**
**D.C. Code Ann. § 32-1301 *et seq*.**
*Against Defendants Petry, Mr. Hayden, and Home Recovery*

263. Plaintiff re-alleges and reasserts each and every allegation set forth above, as if each were set forth herein.

264. At all times relevant to this action, Plaintiff was employed by HCS/HR within the meaning of the DCMWA, D.C. Code Ann. § 32-1002, and is entitled to the rights, protections, and benefits provided under the DCMWA.

265. Section 32-1311(a)(2) of the DCMWA provides "[i]t shall be unlawful for any employer to discharge, threaten, penalize, or in any other manner discriminate or retaliate against any employee or person because that employee or person has. . . [i]nitiated or is about to initiate a proceeding under or related to this chapter."

266. Plaintiff notified HCS/HR of his intent to initiate a proceeding under the DCMWA in a communication between Plaintiff's counsel and counsel for HCS/HR on or about August 15, 2016.

267. Plaintiff made a formal request through counsel that HCS/HR provide the employment verification necessary for Plaintiff to receive his legal permanent resident status on or about October 27, 2016.

268. Plaintiff, through counsel, followed up on this request on November 3, 2016.

269. On that same day, HCS/HR, through counsel, represented that it would be willing to provide the employment verification requested by Plaintiff.

270. Plaintiff, through counsel, followed up on this representation on November 16, 2016.

271. To date, HCS/HR has failed to provide Plaintiff with employment verification.

272. The failure to provide employment verification by HCS/HR constitutes a willful refusal.

273.  Section 32-1311(b) of the DCMWA provides "[t]he employer, or any person acting on behalf of the employer, taking adverse action against an employee within 90 days of an employee or other person's engagement in the activities set forth in subsection (a) of this section shall raise the presumption that such action is retaliation . . .".

274.  On information and belief, the refusal of HCS/HR to provide Plaintiff with the requested employment verification is based upon Plaintiff's complaint to Defendants of violations of the DCMWA in the August 15, 2016 demand letter.

275.  Defendants' refusal constitutes an adverse action, and occurred within 90 days of Plaintiff notifying HCS/HR of his intent to initiate a proceeding under the DCMWA.

276.  Defendants are liable to Plaintiff under § 32-1311(c) for compensation lost as a result of their refusal to provide employment verification, liquidated damages, reasonable attorneys' fees, costs, and any other form of relief this Court deems appropriate.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that the Court:

1.      Grant judgment in favor of Plaintiff against all Defendants for Actual Fraud in violation of Virginia common law under Count I, with unpaid wages, compensatory damages, punitive damages, plus interest (pre- and post-judgment) to Plaintiff, in an amount to be determined at trial;

2.      Grant judgment in favor of Plaintiff against all Defendants, jointly and severally, for Conspiracy to Commit Fraud in violation of Virginia common law under Count II, with unpaid wages, compensatory damages, punitive damages, plus interest (pre- and post-judgment) to Plaintiff in an amount to be determined at trial;

3. Grant judgment in favor of Plaintiff against all Defendants for Constructive Fraud in violation of Virginia common law under Count III, with unpaid wages, compensatory damages, plus interest (pre- and post-judgment) in an amount to be determined at trial;

4. Grant judgment in favor of Plaintiff against all Defendants for Conversion in violation of Virginia Common law under Count IV, with unpaid wages, compensatory damages, punitive damages, plus interest (pre- and post-judgment) in an amount to be determined at trial;

5. Grant judgment in favor of Plaintiff against Defendants Petry, Mr. Hayden, and Home Recovery for breach of contract in violation of the common law of the District of Columbia under Count V;

6. Grant judgment in favor of Plaintiff against Defendants Petry, Mr. Hayden, and Home Recovery for nonpayment of regular and overtime wages under Count VI as authorized by the FLSA, § 216(b), liquidated damages, plus interest (pre- and post-judgment), attorneys' fees and costs;

7. Grant judgment in favor of Plaintiff against Defendants Petry, Mr. Hayden, and Home Recovery for retaliation under Count VII as authorized by the FLSA, § 216(b), liquidated damages, plus interest (pre- and post-judgment), attorneys' fees, and costs;

8. Grant judgment in favor of Plaintiff against Defendants Petry, Mr. Hayden, and Home Recovery for nonpayment of regular and overtime wages under Count VIII and award Plaintiff unpaid wages as authorized by D.C. Code. Ann § 32-1012, liquidated damages, plus interest (pre- and post-judgment), attorneys' fees, and costs;

9. Grant judgment in favor of Plaintiff against Defendants Petry Mr. Hayden, and Home Recovery for failure to timely pay wages earned and unlawful deductions from wages

earned under Count IX and award Plaintiffs unpaid wages as authorized by D.C. Code. Ann § 32-1308, liquidated damages, plus interest (pre- and post-judgment), attorneys' fees, and costs;

10.    Grant judgment in favor of Plaintiff against Defendants Petry Mr. Hayden, and Home Recovery for retaliation under Count X as authorized by D.C. Code. Ann § 32-1311, liquidated damages, plus interest (pre- and post-judgment), attorneys' fees, and costs; and

11.    Grant Plaintiff such further relief as this Court may deem just and proper.

## **JURY TRIAL DEMAND**

Plaintiff Pankajkumar Lohabare demands a trial by jury on all issues so triable.

Dated: May 9, 2017                                     Respectfully submitted,


                                                    _____/s/_____
                                                    Joshua Erlich, VA Bar No. 81298
                                                    Davia Craumer, VA Bar No. 87426
                                                    Katherine Herrmann, VA Bar No. 83203
                                                    THE ERLICH LAW OFFICE, PLLC
                                                    2111 Wilson Blvd., Ste. 700
                                                    Arlington, VA  22201
                                                    Tel:    (703) 791-9087
                                                    Fax:    (703) 722-8114
                                                    Email: jerlich@erlichlawoffice.com
                                                           dcraumer@erlichlawoffice.com
                                                           kherrmann@erlichlawoffice.com